Edward A. CAMPBELL

v.

Howard SIRAK, Patricia D. James, John L. Gushman, Chester Dezenow, Warren J. Smith and John D. Jacob, Members of the Board of Trustees of The Ohio State University; Harold J. Enarson, President; and Albert J. Kuhn, Provost.

No. C-2-76-406.

United States District Court,
S. D. Ohio, E. D.

May 31, 1979.

Andrew M. Fishman, Columbus, Ohio, for plaintiff.

Denis J. Murphy, Columbus, Ohio, for defendants.

## OPINION AND ORDER

DUNCAN, District Judge.

Plaintiff, Dr. Edward Campbell, filed this action on June 1, 1976, under 42 U.S.C. § 1983 against defendants, the Board of Trustees and several named officers of The Ohio State University (OSU). Plaintiff claims he was civilly wronged under federal and state law in connection with the termination of his employment at OSU. Jurisdiction is not disputed.

In his complaint, plaintiff listed four federal and three state claims. He alleged that defendants' termination of his employment violated federal law because it was:

1. contrary to due process and equal protection;

2. in retaliation for the exercise of First Amendment rights;

3. in violation of his right to tenure; and

4. in violation of R.C. 3335.09, requiring the Board to act to remove university employees.

He also alleged that defendants' termination of his employment violated state law because it was:

1. in breach of contract; and

2. otherwise in violation of State law.

Finally, plaintiff alleged that defendants' failure to aid plaintiff in obtaining other employment was a breach of contract or alternatively was breach of a promise upon which plaintiff justifiably relied. Plaintiff requests relief in the form of a declaratory judgment, injunction, and damages.

This Court entered an order on May 9, 1977, in which the Court granted defendants summary judgment on Counts 1, 3 and 4 of plaintiff's complaint, finding that the employment contracts, university regulations, Ohio statutes and affidavits relied upon by Mr. Campbell did not establish that he had tenure or any other form of property interest in continued employment. Issues which remain for decision are whether plaintiff was terminated in retaliation for exercise of First Amendment rights and plaintiff's state law claims based on oral contract.*

In its May 1977 order, the Court held tentatively that the statute of limitations concerning both the First Amendment and the contract claims is six years, and that plaintiff's causes of action arose no sooner than June 1, 1970. Upon closer examination, I reaffirm that holding. Both claims are governed by R.C. 2305.07, which provides a six-year period for bringing actions "upon a contract not in writing, express or implied, or upon a liability created by statute . . . ." *Mason v. Owens-Illinois*, 517 F.2d 520 (6th Cir.1975). This case was filed June 1, 1976. It was established at trial that if plaintiff's contract had been renewed, it would have been submitted to the Trustees in the first week in June, 1970. The failure to submit the contract to the Trustees at that time was the final act triggering the non-renewal of plaintiff's employment. Therefore, his cause of action did not accrue before June 1, 1970, and is not barred by the applicable Ohio statute of limitations.

This case was tried to the Court. On the basis of the evidence adduced at trial, and with the aid of the arguments of counsel at trial and their submission of proposed findings of fact and conclusions of law, the Court finds the following facts and makes the following conclusions of law.

### A. *Factual Background*

1. In August 1967, Dr. Edward A. Campbell was employed at the Pennsylvania State University in the College of Education as a research associate in vocational education by virtue of an appointment which ran from April 1, 1966, to April 30, 1968, at the salary of $10,656 per year. The printed appointment form stated that it was a "regular, full-time noncontinuing appointment (not subject to tenure)."

---

* The parties have referred to, and the Court is aware of, no other state law that is affected by these facts.

2. In August 1967, Campbell began looking for other employment and made a telephone inquiry to the Division of Campus Planning at The Ohio State University. In response, on August 4, 1967, defendant William Griffith, Director of the Division of Campus Planning, wrote a letter to Campbell concerning the availability of a position as Research Associate in the Division. Griffith's letter stated that the position was titled "Research Associate" and would involve the following two major types of activity:

The first is to work with departments of instruction or other functional units on campus to bring together data from which the educational planner writes a program of requirements (or educational specifications) for new or remodeled buildings. This activity requires a general knowledge of the university's instructional programs, but more importantly demands knowledge of planning techniques, methods of instruction, physical environment standards, and university space standards.

The second major activity is to assist departments of instruction or other functional units involving space need problems of an immediate nature. This activity involves assignment or re-assignment of existing space both indoor and outdoor on campus. . . . The role of the educational planner in this process is to analyze the request in terms of the unit's needs, the interests of the university at large, and the precepts of the university's comprehensive master plan and to approve or disapprove the request.

Griffith's letter further provided, *inter alia*, that the position was a 12-month assignment and that a "courtesy" appointment in the School of Education at appropriate faculty rank could be arranged if the person taking the position desired. The letter made no mention of teaching responsibilities.

3. Campbell was invited to visit the OSU campus, which he did on September 29, 1967. Because Campbell expressed interest in the courtesy appointment, Griffith scheduled a meeting for Campbell with the Dean of the College of Education, Dr. John A. Ramseyer.

4. Evidence on discussions during Campbell's visit is sparse. Campbell testified that he discussed with Dean Ramseyer of the School of Education the fact that Griffith had assured him rank as Assistant Professor and had stated that rank as Associate Professor would be applied for through the graduate school. Campbell testified that he was told by Dean Ramseyer that both positions were "tenure track" positions, that Associate Professor carried tenure and that if the application for Associate Professor was not approved, Campbell would get credit for his prior faculty time at other educational institutions which would move him toward the 21-quarter requirement for tenure as Assistant Professor. Dr. Ramseyer died in 1969, and Campbell's testimony as to what Ramseyer said is neither contradicted nor corroborated.

The evidence does establish, however, that Campbell asked Ramseyer and Griffith, "What happens if it doesn't work out?" and was told by Griffith, "We'll help you find another job."

Campbell did talk with Griffith concerning the nature of courtesy rank at no salary. Griffith testified that he told Campbell that "courtesy rank" carried no tenure.

5. During his visit to OSU, Campbell was orally extended an invitation to join the staff of the Division of Campus Planning and that oral invitation was confirmed in writing by letter from Griffith to Campbell dated October 2, 1967. That letter stated that Campbell was invited to join the staff in the Division as a "Research Associate (Educational Planner)"; that the position was a 12-month appointment; that the position would "also carry rank at no salary (courtesy rank) in the School of Education"; that rank as Assistant Professor was assured; and that rank as Associate Professor required approval by the graduate school. The letter did not elaborate on the duties of the position and did not refer to teaching responsibilities.

6. Contemporaneously with his seeking employment at OSU, Campbell had also made inquiries concerning a position at Clarion State College. He received a letter from Clarion dated September 7, 1967, outlining a position of Associate Professor and Project Director carrying a salary range from $12,075 to $16,170. Prior to his visit to OSU, Campbell had accepted the Clarion position at a salary in excess of the $13,688 which was offered by OSU.

7. After receiving the invitation to join the Division of Campus Planning at OSU, Campbell revoked his acceptance of the Clarion State College position, advising that he had been offered a position at OSU which was a continuing position and that he could not turn it down because he was looking for a continuing appointment.

8. In the meantime, Griffith had handwritten an appointment recommendation dated October 1, 1967, calling for an appointment effective December 1, 1967, at a salary of $13,668 as Research Associate in the Division of Campus Planning.

9. That handwritten form was the draft for the actual appointment recommendation dated December 1, 1967, which was submitted to the Board of Trustees. This form had the box marked "faculty" checked, did not have the area labeled "for non-faculty only" filled in; and had "regular" checked as the type of appointment. "Faculty" was defined on the form "for the purposes of this form" to include all persons with the title of Instructor through Professor, Lecturer, and Dean, plus the President, his Cabinet, the Secretaries of the Colleges and the Graduate School, the Directors of Mershon Center, and Admissions, and the Registrar. "Regular" is explained on the form as referring to a position which is automatically renewed at the beginning of each fiscal year. "Special" is an appointment for a specified period of time which is automatically terminated at the end of this period. A specific request via an Appointment Recommendation form is necessary to effect nonrenewal of a regular appointment or to continue a special appointment.

10. As a research associate, Campbell accepted an appointment to a "regular" staff position in the Division of Campus Planning. "Regular" positions include professional staff of the University not necessarily associated with an academic unit. As such, said position was intended to be continuing in nature and renewable from year to year. Campbell's initial contract expired by its terms June 30, 1968. It was automatically renewed July 1, 1968, for 12 months, replaced with a six-month contract January 1, 1969, and renewed July 1, 1969, for 12 months.

11. The Division of Campus Planning is not an academic department, has no teaching responsibilities, and has no responsibilities for development of curricula or selection and/or promotion of persons associated with the University who are on a tenure track. As an employee of the Division, Campbell was obligated to spend full time on Division work.

12. At the time that Campbell interviewed at Ohio State University, prior to being offered and accepting the appointment in the Division of Campus Planning, Griffith himself enjoyed a "courtesy appointment (no salary)" as Assistant Professor in the School of Education. Although none of the written documents available at the time define the term "courtesy appointment," I find said position is not on a tenure track, does not carry with it tenure, and is merely an honorary title incidental to a paid staff or administrative position.

13. On October 9, 1967, Campbell wrote a letter to Griffith in which he accepted the position that had been offered to him in the Division of Campus Planning. Said letter of acceptance provided:

Your hospitality was most appreciated and I am looking forward to joining your staff.

I would appreciate it if you would present me to the Graduate School as I would prefer the rank of Associate Professor.

14. On October 16, 1967, Griffith sent a letter to Campbell indicating he would petition the Graduate School for the courtesy rank of Associate Professor, and Campbell

in response thereto submitted documentation concerning his background and publications to Griffith to be forwarded to the Graduate School.

15. On October 30, 1967, Griffith sent a letter to Dean Ramseyer and Dr. Richard Armitage which stated:

I am by this letter requesting consideration for courtesy rank (no salary) as Associate Professor in the School of Education for Dr. Campbell.

Griffith's request was acknowledged in a letter dated November 1, 1967, to Griffith by Arliss Roaden, Associate Director of the School of Education. Neither the Graduate School nor the School of Education acted further on Griffith's request regarding Campbell's appointment to courtesy rank as Associate Professor. No paper work for either courtesy appointment was ever formally processed by the University.

Similarly, Campbell made no attempts, formal or otherwise, to secure formal approval of his application for appointment to the courtesy rank of associate professor at no salary. Neither did he make any such efforts with regard to formal processing of his courtesy rank of assistant professor at no salary. Campbell never asserted having academic rank at any time in writing or otherwise during his employment.

16. Campbell joined the staff of the Division of Campus Planning on or about December 14, 1967, and on that day he was given, for the first time, a series of books and pamphlets, including a faculty handbook, which were given to all newcomers in the Division of Campus Planning and described, *inter alia* rules and regulations governing the appointment, promotion and tenure of faculty and staff at OSU. Campbell read these documents for the first time on his first day of work.

17. Section 8 of Article IV of the By-Laws of the Board of Trustees states:

The Board of Trustees shall annually elect the President, members of the faculty and all other employees of the University not in the classified civil service. It is, however, the desire and intention of the Board that these persons shall be permanent in their positions, subject to (a) continued efficiency in service, (b) the provisions of the Revised Code of Ohio, and (c) the rules relating to tenure promulgated by the Board of Trustees.

18. The "Faculty Handbook" states on page 15:

Regular staff members are those employed for what is expected to be continuous full-time, long-term service at the Ohio State University. Special staff members are those employed for specific periods of time to perform a specific short-term service. All graduate students employed as teaching assistants, for example, are employed as special staff members while appointments to the professorial ranks (unless designated as visiting or clinical) are considered regular appointments.

19. The University Faculty is defined in Article IV, Section 1 of the By-Laws to include the members of the President's Cabinet, the Deans; the Associate Deans, Assistant Deans, and Secretaries of the Colleges of the Graduate School; all persons with the faculty rank of Professor, Associate Professor, Assistant Professor, and Instructor (providing that persons holding the rank of Instructor have served the University on a regular appointment in that rank for at least six quarters); all persons with the faculty rank of Professor Emeritus; the Director, Mershon Center for Education in National Security; the Director of Libraries; the Registrar; and the Director of Admissions.

20. The booklet entitled "Faculty Appointments, Promotions and Tenure" states in part I:

2. Those sections of the Rules relating to appointment and tenure include the following:

21.05 election of faculty and staff; tenure.

The Board of Trustees shall annually elect the President and all employees of the University not in the classified civil service. However, permanent tenure is an attribute of all academic ranks, sub-

ject to a period of probation as established by action of the Board of Trustees. It is terminable only by voluntary resignation, by retirement, by death, or for incompetence, grave misconduct or for the causes set forth in rule 21.03.

.     .     .     .     .

3. In Part II of this publication certain probationary periods are established for several faculty ranks. In determining the years under contract in these probationary periods, part-time service and service on special contract will not be credited toward the attainment of tenure. For the purpose of this statement:

a. "part-time service" is defined as less than 50% service to the University or to the University-related units.

b. "special contract" is defined as a contract given to a person whose appointment is temporary; while this temporary appointment may be renewed, it does not indicate permanence of appointment.

And in Part II as follows:

3. In certain of the faculty ranks set forth below a period of probation is established as a prerequisite to obtaining tenure. In general, the University will follow these periods. However, in the exceptional cases and when the person involved has had prior service at or above the level of instructor at this or another university or organization, such prior service may be included as part of the probationary period.

And further:

B. FACULTY RANKS

.     .     .     .     .

Assistant Professor

.     .     .     .     .

c. *Tenure*: Before an Assistant Professor will be granted tenure, a 7-year probationary period must be met. Service to the University as an instructor will be counted in meeting this probational requirement. During his 7th year of service the person involved will be informed by the Dean if he is to be granted tenure beginning with his 8th year of service. If tenure is not granted, his

service with the University will be terminated and assistance will be given to him towards securing a position elsewhere. The University, through the appropriate department Chairman, will make every effort to inform the person involved, during the 4th year of his service to the University (including service as an instructor) as to whether he is to be considered for tenure. If he is informed that he is not considered a candidate for tenure, his services will be terminated at the end of the 4th year and assistance will be given him towards securing a position elsewhere.

The period of time described in this section may be adjusted in exceptional cases according to Part II, Section 3, of this publication [quoted above].

Associate Professor

.     .     .     .     .

c. *Tenure*: A person promoted to Associate Professor from a lower faculty rank at this University will acquire tenure upon the effective date of his promotion.

A person appointed from outside of this University to Associate Professor shall normally serve a two-year probationary period. During his second year the person involved will be informed by the Dean if he is to be granted tenure beginning with his 3rd year of service. If tenure is not granted, his services with the University will be terminated at the end of that academic year and assistance will be given him towards securing a position elsewhere.

The period of time described in this section may be adjusted in exceptional cases according to part II, Section 3, of this publication [quoted above].

21. After his arrival at OSU, Campbell was given an agreement or contract dated November 14, 1967. That contract labeled his appointment as a "regular appointment" for 100% full-time employment as a research associate in the Division of Campus Planning. The agreement establishes that Campbell's beginning salary was $13,668

and that the position was for 12 months, although it became effective December 1, 1967, and the contract year ended at the end of the fiscal year, or June 30, 1968. The agreement did not include a reference to appointment of Campbell to any academic rank; nor did it refer to tenure or post-termination assistance or pay. Subsequent notices of appointment were similar. Campbell signed this agreement on January 13, 1968. The instrument expressly incorporated the rules and regulations quoted above by reference and conditioned its effectiveness "upon full compliance therewith." On the back of that agreement is stated "for 'regular' appointments—information regarding tenure":

> The Board of Trustees shall annually elect the President, members of the faculty and all other employees of the University not in the Classified Civil Service. It is, however, the desire and intention of the Board that these persons shall be permanent in their positions, subject to (a) continued efficiency in service, (b) the provisions of the Revised Code of Ohio, and (c) the rules relating to tenure promulgated by the Board of Trustees. Article IV, Section 8, By-Laws, Board of Trustees.

> The rules relating to tenure are found in Chapter 21.00 of the rules for the University faculty.

The agreement also provided information "for 'special' appointments."

22. In 1968 Campbell commenced to work on assignments in the Division of Campus Planning. Campbell's responsibilities as a research associate/educational planner were as outlined in Griffith's letter of August 4, 1967: to determine the needs of the academic departments which would occupy newly constructed or remodeled space for projects assigned to him, and to program the needs of those departments prior to design and construction of said facilities within the applicable budget for such construction. His work involved no teaching duties.

23. As a consequence of his work, Campbell was required to meet regularly with various administrative heads of academic departments, as well as the University architect, Hollie Shupe, and other individuals involved in the planning, construction and maintenance of capital facilities at Ohio State University and its branch campuses.

Campbell was assigned to work on the Lima Technical Institute facility at The Ohio State University campus in Lima, Ohio, and in the course of his dealing with academic and administrative staff persons associated with Ohio State University in conjunction with the planning of that facility, made remarks which caused Hollie Shupe to "explode." The explosion was occasioned by Campbell's reference to the design of a building to be incorporated into the Lima Campus as a "flying saucer among the trees." Thereafter, Shupe met with Griffith for lunch and complained to Griffith that "it's not what Campbell says but how he says it." Griffith incorporated his discussion with Shupe into a memo dated March 10, 1969. Campbell obtained a copy of that memo. His testimony was that he found it on the floor of the Division of Campus Planning on or about June 11, 1969.

24. Before his appointment, Campbell had written a doctoral dissertation entitled "Schoolhouse Design for Safe Evacuation in the Event of Fire or Like Emergencies: State Statutes and State Life Safety Codes Compared with the Building Exits Code, 1961." He considered himself to be an expert in fire safety, having researched and written on the subject and having maintained an avid interest in the area.

During the course of his employment at Ohio State University, Campbell claimed that he was doing "scholarly research" in the fire safety area concerned mainly with "life" safety. This entailed his involvement in an advisory capacity to the Columbus Fire Department, attending numerous fires and critiquing the fire-fighting techniques at the request of that Department; writing on the subject and discussing the subject at length and with frequency in connection with his work planning buildings at OSU. This activity caused Campbell to spend a considerable amount of time with officials

of the Columbus, Ohio, fire department. Campbell would, from time to time, spend evenings and weekends at a local fire house awaiting the ringing of a bell and a call to a fire. On at least five occasions, Campbell attended three alarm fires during the course of his work day at Ohio State University.

25. At some time during his stay at OSU, Campbell made a number of public announcements in which he referred to specific University facilities as "fire traps." He also criticized the University selection of architects as being politically motivated rather than based upon merit. Campbell also raised public objections to the failure to include certain structural safety mechanisms in the Lima and Mansfield Technical Center projects purely because of cost considerations.

26. Griffith on a regular periodic basis meets with employees of the Division of Campus Planning to evaluate their progress as employees in the Division. At least two such interviews were conducted in 1968 in which Campbell's progress was reviewed.

27. On March 17, 1969, Campbell met with Griffith for a periodic evaluation of Campbell's progress as an employee of the Division of Campus Planning. According to memos prepared by both Campbell and Griffith, Campbell's work product was reviewed generally and Griffith informed Campbell of his (Griffith's) dissatisfaction with the quantity and quality of work being done by Campbell. At this meeting, according to both memos, Campbell was warned that his "fire safety activities" were believed to be interfering with his performance in the Division of Campus Planning. Griffith told Campbell to "get off that fire safety kick." Campbell was given a cost of living pay increase of 4.5% with no additional merit increase; he was also told to improve his performance within a year or seek other employment.

28. Campbell did not believe Griffith meant what he said in his warning. Rather, he believed that his publications, speeches and work in the fire safety area made Griffith jealous and caused the misunderstandings between them.

29. During 1969 Griffith's dissatisfaction with Campbell's work performance continued to grow. Without making any finding on Dr. Campbell's actual competence in his position, I do find that Griffith's dissatisfaction was based upon what he perceived to be Campbell's unwillingness or inability to perform adequately. Griffith found Campbell was not very productive, was slow to complete assignments and then presented the results in an unfinished state. During 1969, Griffith complained that no work had been done on several projects assigned Campbell two to eight months before and on occasion he ignored explicit directives from Griffith. Griffith consulted several times with Dr. Edward Moulton, Vice President in charge of administration, his superior in administration at the University, and following one such consultation with Moulton, on September 9, 1969, Campbell was again warned that unless his job progress improved before March 1970, his contract would not be renewed at the end of June 30, 1970.

In the fall of 1969 Griffith became dissatisfied with Campbell's performance of planning and programming work on University Hall. On at least one occasion, Campbell fell into a heated exchange with Francis Anderson, Assistant to the Dean of the College of Humanities.

30. On January 17 and 19, 1970, Griffith again met with Campbell concerning his job performance. On January 19, 1970, Griffith informed Campbell that he intended to recommend that his contract not be renewed after its expiration on June 30, 1970. The warning was repeated at another conference held with Campbell on February 23, 1970.

31. At a meeting with Campbell sometime after March 10, 1970, Griffith offered Campbell the opportunity to resign rather than face non-renewal. Campbell asked, "What are your terms?" Griffith replied, "None." Campbell responded, "Then fire me."

32. On March 17, 1970, seven days after Campbell wrote a letter to the Dushane

Fund seeking assistance concerning his employment situation in which he acknowledged his understanding that his contract was not to be renewed, he gave a speech in Atlantic City on the subject of "A Fire Safety Program that Can Cope with Disaster." Campbell's trip was authorized and paid for by the University. No evidence has been presented to suggest that anyone at Ohio State University was present at the time such speech was given nor thereafter, that anyone in the administration of Ohio State University reviewed or discussed said speech.

33. On March 30, 1970, Campbell was personally given a letter signed by Griffith with a copy to Moulton, in which he was formally advised that his contract was not to be renewed. This occurred at a conference held in the offices of the Division of Campus Planning at which Moulton was present.

Campbell did not raise the questions of faculty rank, tenure, post-termination aid or pay at any of the meetings held through March 30, 1970.

34. On April 1, 1970, Campbell's attorney wrote Vice President Moulton requesting he supply a letter of recommendation. There was some testimony that in view of the refusal by OSU to grant a termination hearing and perceived hostility on the part of Griffith, this request was not pursued.

## I. *Breach of Contract*

The plaintiff claims that he accepted the position at OSU and retained it in reliance on certain promises made to him by various university officials. These promises relate to tenure and aid in finding a new position. The Court has already determined that no tenure was conferred upon Campbell by the employment contracts, university regulations, Ohio statutes or affidavits presented to the Court in prior proceedings in this case. Campbell bases his tenure claims, therefore, on certain representations made verbally by Ramseyer and in written communications by Griffith. His argument is that promissory estoppel applies in the absence of consideration to enforce the promises made.

It appears that Ohio does recognize the doctrine of promissory estoppel as set forth in the Restatement of Contracts, 2d, § 90. *See Grove v. Ohio State University, College of Veterinary Medicine,* 424 F.Supp. 377, 389 (S.D.Ohio 1976); *Richter v. First National Bank of Cincinnati,* 82 Ohio App. 421, 80 N.E.2d 243, 246 (Ct.App. Hamilton Cty. 1947); *W. B. Saunders Co. v. Galbraith,* 40 Ohio App. 155, 159, 178 N.E. 34, 35 (1931).

■ In order to hold that promissory estoppel applies in a particular case, the Court must be satisfied that a promisor made a promise, which the promisor should reasonably have expected to induce reliance in the form of action or forbearance of a definite and substantial character on the part of the promisee; that the promise in fact induced such reliance by the promisee, and that enforcement of the promise is necessary in order to avoid injustice.

The Court has no difficulty believing that Campbell did, in fact, rely to his detriment upon what he perceived to be promises of the University. By moving to Columbus, leaving his existing position at Pennsylvania State, and rescinding an appointment at Clarion State because it was not a "continuing appointment," Campbell incurred sufficient detriment to establish the sort of reliance supporting promissory estoppel. By remaining at OSU and by not seeking a position elsewhere, he apparently continued this reliance, since he was forfeiting his opportunity to earn tenure elsewhere.

■ The real difficulty in plaintiff's case is determining whether Campbell's reliance was on a "promise," and whether the "promisor" should reasonably have expected the reliance induced. Viewing the evidence as a whole, the Court is convinced that Campbell relied unreasonably upon his own mistaken beliefs, and not upon promises made to him by others. Campbell's misperceptions may have resulted from certain statements made to him, but only by virtue of a series of inferences drawn by Campbell that were not reasonable in view of circumstances warranting a contrary conclusion.

The first statement upon which Campbell's reliance was based is contained in the August 4, 1967, letter from William Griffith, Director of the Division of Campus Planning. Griffith described the position as that of "research associate" and expressly stated that it was a 12-month assignment. Since Campbell was, at that time, a research associate at Pennsylvania State University, and that position carried no tenure, the reasonable inference would appear to be that a position carrying the same title at OSU would, in all likelihood, also lack that attribute. In the letter, however, Griffith also referred to the possibility of arranging a "courtesy" appointment in the School of Education at appropriate faculty rank. The precise nature of "courtesy" rank was apparently the source of much confusion between the parties. It appears that Campbell disregarded the word "courtesy" and concentrated on the word "rank" which he took to refer to a functioning position of active academic rank which would accrue ordinary tenure rights and thus ultimately ensure his continued employment. The University, on the other hand, intended this term to confer an honorary title incidental to plaintiff's working position that would enable plaintiff to affiliate with academic persons in plaintiff's discipline.

The next statements upon which plaintiff relied occurred during his September 29, 1967, on-campus interview. Plaintiff's primary emphasis is upon promises he alleges were made by Griffith and by Dean Ramseyer, now deceased, to the effect that Campbell's position either carried tenure or placed him in a procedure by which he would earn tenure. I am reluctant to find any promises regarding tenure were made during the interview. This is because, as to Ramseyer, "testimony as to the uncorroborated oral statement of a deceased person is the weakest form of evidence." *Sheppard v. Maxwell,* 346 F.2d 707 (6th Cir. 1965), reversed and remanded on other grounds, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). As far as Griffith is concerned, Campbell's assertions are directly contradicted by Griffith's testimony that he explained to Campbell that courtesy rank did not carry tenure. I found Griffith to be a highly credible witness. Campbell's testimony is further weakened by his own testimony that he questioned both Ramseyer and Griffith regarding "what happens if it doesn't work out?" and that the response was, "we'll help you find another job." This indicates Campbell was aware of the terminable nature of his prospective employment. Finally, the statement that OSU would apply to the Graduate School for a courtesy appointment for Campbell as Associate Professor was not a promise that Campbell would have such rank. *Grove, supra,* at 389.

Even if it is assumed that the nature of "courtesy rank" was not explained to Campbell, and that he therefore reasonably believed he was in a tenure track position, his case must fail. Crediting his testimony as to what Ramseyer told him, Campbell was informed that he would have tenure if he came to OSU as an Associate Professor, and that he would be in a probationary status for a period of some years if he came to OSU as an Assistant Professor. Campbell was aware that he was not arriving at OSU as an Associate Professor and he would not be automatically tenured.

Campbell was promised the courtesy rank of Assistant Professor. Even construing this as a promise of active rank at that level, and therefore as within a tenure procedure, this promise could only guarantee that Campbell would be employed on a probationary basis, subject to continued efficiency in service as provided by Article IV, § 8 of the By-Laws.

Based on these considerations, the Court must conclude that plaintiff has failed to establish by a preponderance of the evidence, that any promises were made regarding tenure that were reasonably expected to induce plaintiff to accept the position as research associate.

Plaintiff next claims that certain events occurring during his employment induced him to retain his position and not seek a true tenure position elsewhere. His reliance during his employment rested wholly

upon representations by others to persons within and without the University that Campbell was a member of the OSU faculty. For example, evidence was adduced at trial to show that as a favor to Campbell to help him get an appointment on the National Fire Safety Commission, Griffith wrote several letters for the University President's signature referring to Campbell as "a member of our faculty"; that Campbell was a member of the "Faculty Club," received a faculty automobile registration, attended a "new faculty" meeting in the Fall of 1968, and received faculty privileges with regard to the purchase of athletic activity tickets; and that after some difficulties, Campbell received a faculty discount at the University Bookstore.

The Court is of the opinion, however, that any reliance upon Campbell's status as "faculty" is unreasonable. A reading of his employment contracts or the pertinent rules and regulations, which plaintiff did read the first day on his job, makes clear that "faculty" is defined by the University to include both tenured and nontenured employees and both teaching, administrative and certain support staff. Those regulations also make clear that tenure is an attribute of academic ranks only. Tenure is an incident of employment that is designed to assure teachers and scholars freedom to speak, write and teach freely without fear of retaliation. It necessarily applies to guarantee educational freedoms to those who earn their livelihood by educating; it is inapplicable and inappropriate to administrative, staff, or other non-academic offices. Campbell was hired as an administrative researcher in an administrative division having no educational function. Campbell had no teaching duties; on the contrary, he was obligated to devote himself full-time to space allocation and planning in University buildings. He was paid for his administrative work, not for his outside interests, even though those interests were arguably helpful in the line of work for which he was hired. Under these circumstances, it was unreasonable for Campbell to surmise that his enjoyment of certain privileges of faculty guaranteed him the coveted attribute of

academic ranks: tenure. If some question was raised by the reference to courtesy faculty rank, a reasonable person would be prompted to request clarification of his status. This he did not do.

Moreover, a reasonable person, when informed in March of 1969 that he should look for another job because he was not performing satisfactorily, if under the impression that he had tenure by virtue of his "assured" courtesy rank appointment, would have inquired as to this status at that time.

I simply cannot discern any credible evidence that promises were made during plaintiff Campbell's employment that it could not be terminated at the end of a contract year. His contract so states, and the rules and regulations do not imply otherwise. Representations that Campbell was a faculty member are not indicative of tenure. Quite to the contrary, the reasonable person would have concluded that an administrative position devoid of academic responsibilities would not carry uniquely academic privileges.

There remains the question of promises that the University would aid plaintiff in finding employment upon his termination. At the September 1967 interview Griffith responded to Campbell's request on this matter that the University would help Campbell find another position. No more specific promises were made. Plaintiff has not shown that he relied upon this promise. Indeed, after an initial request, in view of the refusal of OSU to grant a hearing and the perceived hostility of Griffith, such aid was not sought.

Even if plaintiff had demonstrated that he relied on this promise to his detriment, and that any such reliance was reasonable, the promise is sufficiently amorphous that it would be unenforceable because of uncertainty. Plaintiff had significant difficulty in finding employment, but on careful review of the exhibits of his letters of inquiry and rejections, it appears to the Court that this was the result less of the failure of OSU to aid in his placement and more of

Campbell's insistence on his being fired and his lack of qualifications for the positions he later sought. Moreover, the parameters of the proffered assistance are uncertain and difficult of enforcement.

*Plaintiff's First Amendment Claims*

Campbell's second claim is that he was fired in retaliation for his exercise of free speech rights. The evidence in this case establishes that Campbell engaged in several types of speech. First, there was his research and writing in the area of fire safety. He had earned his doctorate in the area, had written a series of short articles for various periodicals on the subject, and continued to maintain an avid interest in the specialty. Second, there were disagreements with other university employees, notably Hollie Shupe, Francis Anderson and William Griffith. At some time during his employment at OSU Campbell made public announcements criticizing safety aspects of University facilities and the selection process for University architects. Finally, on March 17, 1970, Campbell gave a speech in Atlantic City relating to fire safety.

The latter speech is irrelevant to the issues in this case. It was made long after Campbell had been warned that his position was not to be renewed, and a week after he admitted in his own letter that he was aware of the nonrenewal of his contract. Moreover, Campbell was authorized and reimbursed by the University to go to Atlantic City to give the speech. Finally, there is no evidence that any of the defendants were aware of the contents of the speech.

Therefore, an analysis of plaintiff's claim must inquire whether plaintiff was fired in retaliation for his exercise of scholarly, critical or personal expression.

■ It is established law that Campbell's claims under the First and Fourteenth Amendments are not defeated by the fact that he did not have tenure. Even though he could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him, *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), he may nonetheless establish a claim if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 284, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

■ The threshold question is whether Campbell's speech is constitutionally protected. This question entails a balancing between the interests of Campbell, as a citizen, in commenting upon matters of public concern, and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

■ Certainly, Campbell's writing, on a scholarly level, was protected expression. To the extent of its message, it neither interfered with the services provided by the university nor went beyond the bounds of speech which Campbell, as a citizen, was entitled to exercise. As will be discussed below, the non-speech ramifications of Campbell's work in the fire safety area—such as his absence from work to attend fires—are outside the scope of protected expression. Campbell's public criticism is also protected speech. The state has no legitimate interest in suppressing public criticism of its architect selection process or the safety hazards of its facilities. Indeed, there is no reason to believe the University would not benefit from public debate of these subjects.

The difficulty in balancing arises with respect to Campbell's private comments. In a recent opinion, the United States Supreme Court rejected the notion that the First Amendment does not protect private expression by a state employee, saying,

Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.

*Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979). The Court noted, however, that "striking the *Pickering* balance" may be affected by different considerations when private expression is involved.

> When a teacher speaks publicly, it is generally the *content* of his statements that must be assessed to determine whether they "in any way either impeded the teachers proper performance of his daily duties in the classroom or . . . interfered with the regular operation of the schools generally." *Pickering v. Board of Education, supra,* 391 U.S., at 572–573, 88 S.Ct. 1737. Private expression, however, may in some situations bring additional factors to the *Pickering* calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message, but also by the manner, time, and place in which it is delivered.

439 U.S. at 415, n. 4, 99 S.Ct. at 696 n. 4. The *Givhan* court also recognized that figuring in the balance struck in *Pickering* was the fact that the claimant's public statements in that case had "not adversely affected his working relationship with the objects of his criticism," that the statements were not directed towards any person with whom appellant would normally be in contact in the course of his daily work, and therefore, no question of maintaining either discipline by immediate superiors or harmony among co-workers was presented in *Pickering*. The employment relationships affected by Pickering's speech were "not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Givhan, supra,* at 415 n. 3, 99 S.Ct. at 696 n. 3, quoting *Pickering, supra,* 391 U.S. at 569–70, 88 S.Ct. 1731.

The different considerations noted by the Supreme Court in *Pickering* and *Givhan* tip the balance in this case. The facts establish that Campbell's relations with the Universi-

ty architect, Hollie Shupe, became strained after Campbell described one of Shupe's building designs as a "flying saucer among the trees." Shupe's explosive reaction and complaint to Griffith were predicated on his feeling that "it's not what Campbell says but how he says it." Integral to Campbell's work was the necessity of working closely with the University architect. It is obvious that Campbell's employer would be displeased by such a comment, resulting, as it did, in hostility between University employees whose cooperation was necessary to the effective functioning of the Division of Campus Planning.

Very little can be inferred from the heated exchange with Francis Anderson, with whom Campbell had to work on the University Hall project, since the evidence does not indicate whether it was prompted by Campbell's comments, and, if so, what their content was. At the most, this incident serves as another example of Campbell's inability to relate harmoniously with others within the University.

■ Even if Campbell's personal comments to Shupe were protected speech, I do not find that the non-renewal of his contract was in retaliation for that speech or for any of his other speech activities. The standard and allocation of proof on this issue is set forth in *Mt. Healthy, supra,* and is reaffirmed in *Givhan*. *Mt. Healthy* rejected a Court of Appeals ruling that "the fact that the protected conduct played a 'substantial part' in the actual decision not to renew would necessarily amount to a constitutional violation justifying remedial action." *Mt. Healthy, supra,* 429 U.S. at 285, 97 S.Ct. at 575. The Court was concerned that such a rule "would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—even if the same decision would have been reached had the incident not occurred." The Court therefore propounded a "but for" test: whereas the burden is properly on the claimant to show that

his First Amendment conduct was a motivating factor in the state employer's decision not to rehire, that thereafter the employer must show by a preponderance of the evidence that it would have reached the same decision in the absence of the protected conduct. *Id.* at 266, 97 S.Ct. 568.

There is a failure of proof on the part of plaintiff regarding the impact of his scholarly writing and speaking in the area of fire safety. While Campbell continued to publish various articles on the subject during his employment at OSU, there is no indication that anyone at OSU, including Griffith, ever read or was aware of the contents of those articles. Certain activities connected with this outside interest can validly be said to have influenced defendants' decision; Campbell's absences from work for the purpose of attending local fires, for example. But while this conduct may have provided an empirical basis for Campbell's publications, it was not so related to his exercise of speech as to be entitled to First Amendment protection.

As for Campbell's private comments and public criticism, I believe the inference may be reasonably drawn that this expression played a role in plaintiff's non-renewal. But these instances appear to be just the sort of "dramatic and perhaps abrasive incident[s] . . . inevitably on the minds of those responsible for the decision to rehire" that prompted the Court's decision in *Mt. Healthy.* Campbell was warned repeatedly that his work was considered unsatisfactory and that he was to spend his time on the work for which he received a salary. The friction caused by his apparent inability to work with others whose cooperation was necessary to the effective functioning of the Division compounded this dissatisfaction. I believe that the evidence shows that the nonrenewal would have occurred in the absence of Campbell's expression.

### Conclusion

In summary, I hold that plaintiff has proved no claim based on oral contract. No promises were made either before or during his employment that could reasonably be expected to induce Campbell to assume or retain the position as a research associate or to maintain it. As to the promise that Campbell would be aided in finding other employment, there was no reliance on this promise such that it should or could be enforced to avoid injustice.

I further hold that plaintiff's nonrenewal was not in retaliation for his exercise of First Amendment rights. The decision was based upon a perceived dissatisfaction with his performance and, although bolstered by a concern that his suppression interfered with the effective functioning of the Division, would have been made in its absence.

Judgment will therefore be entered for the defendants on all claims. Each party will bear their own costs.